UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
- - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

Plaintiff, No. 1:24-CR-000128-PLM

v.

FRANK CLAY, JR., Hon. Paul L. Maloney
U.S. District Judge

Defendant.
________________________________/

## SENTENCING MEMORANDUM OF THE UNITED STATES

Frank Clay, Jr., the defendant, pled guilty to one count of being a felon in possession of a firearm, in violation of Title 18, United States Code Section 922(g). Clay was arrested by Grand Rapids Police Department ("GRPD") officers responding to 911 calls reporting someone was brandishing a pistol around a store in Grand Rapids. When officers arrived at the scene they spoke with victims and witnesses who reported that Clay fired the weapon in the area. The victims then identified Clay on the street as he re-approached the scene. Officers proceeded to approach and arrest Clay, finding both a firearm and a bag containing cocaine on his person.

Clay is now scheduled to be sentenced by this Court on June 2, 2025. The Presentence Investigation Report ("PSR") was filed May 12, 2025. R.35, PageID.103-149. The United States believes the PSR appropriately calculates Clay's guidelines and that a within-guidelines sentence is warranted under the 18 U.S.C. § 3553(a) factors.

## I. FACTUAL BACKGROUND

At approximately 12:25 a.m. on July 9, 2024, a clerk at B&B Party Store in Grand Rapids, Michigan called 911 to report a disorderly person, later identified as Clay, inside his store. Ex. 2;[1] R.35: PSR ¶ 9, PageID.106. During the call the clerk can be heard telling Clay to stay away from him. Ex. 2 at 00:30. GRPD later obtained video footage from the store that shows Clay, who is wearing a black t-shirt and black shorts, inside the store, acting aggressively towards the clerk, including pounding his fists on the counter. Exs. 1A-C; *see e.g.* Ex. 1B at 01:46-02:10.[2] Two other individuals, identified in this filing as Victim 1 and Victim 2, enter the store during the Clay's interaction with the clerk and appear to speak to Clay. Ex. 1C at 02:32-02:50 Victim 1 is wearing a black v-neck shirt with tan cargo shorts. Victim 2 is wearing a red shirt. The victims later spoke with police when they arrived at the scene where they explained that Clay was "flipping out" when they entered the store. Ex. 3.[3]

After the first 911 call, Clay eventually left the store. Ex. 1C at 06:00-06:18. Video footage from the parking lot of the store shows Clay walking around outside the store, including walking up to a woman who appeared to try to enter the store. Ex. 1D. Clay approaches the woman, closely follows her as she turns around and returns to her vehicle. Ex. 1D. Inside the store, the two victims make a purchase and leave the store, however Victim 1 shortly returns, and the clerk then locks

---

[1] Exhibit 2 contains audio from two 911 calls made by the same clerk, both related to Clay. The first call is from 00:00--01:28 of Exhibit 2. The second 911 call is from 01:28—03:58 of Exhibit 2.

[2] Exhibits 1A, 1B, and 1C show three different camera angles from inside the B&B Party Store: Exhibit 1A shows a view of the counter and public area; Exhibit 1B shows behind the counter; and Exhibit 1C shows the front door and public area. Exhibit 1D contains a video from outside the B&B Party Store from the parking lot area. The timestamp on the videos is incorrect and the United States plans to submit testimony during the sentencing hearing related to the timestamp issue.

[3] Exhibit 3 contains body camera footage from July 9, 2024, which includes officers interacting with the B&B Store Clerk, the victims, a third party, and the ultimate arrest of Mr. Clay.

the door of the store. Ex. 1C at 08:45-09:55. The clerk then makes a second 911 call at approximately 12:31 a.m. Ex. 2. Both the clerk and Victim 1 speak to the 911 operator to report Clay's actions outside the store. The clerk states Clay has a pistol. Ex. 2 at 01:40-01:55. Victim 1 states:

> Someone is wandering around here with a pistol. … He got real threatening . . . he over there swinging it around, waving at peoples cars and stuff. … I heard it click and shit. … He got a pistol. ... He's walking back and forth and even went up to some family member car, he walking off right now . . . he got a pistol.

Ex. 2 at 02:22-03:40. After the 911 call, Victim 1 eventually leaves the store.

At approximately 12:40 a.m. two GRPD officers arrive at the scene to speak with witnesses. Ex. 3. GRPD Officer Scavarda's body camera, Exhibit 3, records interactions with the clerk, the victims, and Clay between approximately 12:40 a.m. and 12:45 a.m. Officer Scavarda first asks the clerk if he heard any gun shots, which the clerk confirms he did, pointing down the street. Ex. 3 at 00:00-00:13. While speaking with the clerk, Victims 1 and 2, accompanied by a third individual, return to the scene in a vehicle. Ex. 3 at 00:40. Victim 1 reports that Clay shot at his car and proceeds to describe his interactions with Clay inside and outside the store and providing a description of Clay. Ex. 3 at 00:40-03:45. Both victims report seeing Clay with the firearm around others in the area.[4] Victim 1 reports hearing Clay shoot the gun. Ex. 3 at 02:20-02:25. While speaking to police, Victim 1 pointed down the street in the same direction they reported shots were fired and identified Clay walking down the street towards the officer, less than one block from where the officers and victims are standing. Ex. 3 at 03:42. The victims confirm they are confident the person they identified is the person they saw with a gun.

[4] Victim 2 later told police that he fled the scene after seeing Clay with the firearm and as he ran heard at least five gunshots. R.35: PSR ¶ 12, PageID.108. Victim 1 later reported hearing three gunshots. *Id*. ¶ 13. Following Clay's arrest, officers canvased the area around the B&B Party Store but did not locate any shell casings. *Id.*

Two officers then approach Clay and are soon joined by other GRPD officers. The officers repeatedly tell Clay to put his hands up and on his head. Clay instead, continues to walk around in a street, walking somewhat away from the officers and tossing something in their direction. Ex. 3 at 04:00-04:35. After Clay ignores the officers, he is tased and physically restrained. Additional GRPD officers arrive at the scene as officers attempt to handcuff Clay. Once Clay is in handcuffs, officers roll him onto his back. At that time, one officer says he is reaching to his waistband and another officers announces that they see a gun. Ex. 3 at 06:14-06:18. The officers attempt to recover the firearm while restraining Clay. During this, Officer Scavarda states that Clay is biting him. Ex. 3 at 06:26-06:30. Clay is struck in the face to stop him from biting officers.

Officers recovered the firearm, a Smith & Wesson, Model M&P Shield, .40 cal. semiautomatic pistol. Ex. 4: Photos of firearm; R.35: PSR ¶ 11, PageID.107. The firearm was unloaded when recovered. *Id.* Officers searched Clay's pockets and located a plastic bag containing smaller baggies of cocaine and $228.98. *Id.*; Ex. 5: Photos of controlled substances; Ex. 6: Laboratory Report. The cocaine was initially field tested and was later confirmed by the Michigan State Police ("MSP") Laboratory, which tested one of the smaller baggies. Ex. 6. Both Clay and Officer Scavarda were treated at St. Mary's Hospital following the incident. Clay received stitches and a medical exam. R.35: PSR ¶ 10-11, PageID.107-108.

Following his arrest, officers discovered that Clay was on parole and had been released from the Michigan Department of Corrections on March 5, 2024. *Id.* ¶ 11, 63, PageID.107, 128. This was following 2018 convictions for delivery/manufacture of a controlled substance, firearm possession, and resisting/obstructing/assaulting police. *Id.* Clay has a substantial criminal record, summarized *supra* in Section III. A review of the Smith & Wesson pistol revealed that it had been reported stolen on March 18, 2024. *Id.* ¶ 11, PageID.107.

On September 11, 2024 Clay was indicted with one count of being a felon in possession of a firearm. R.1: Indictment, PageID.1. On January 14, 2025 Clay pled guilty to the indictment before United States Magistrate Judge Phillip J. Green. R.28: R&R on Change of Plea, PageID.53.

## II. THE SENTENCING GUIDELINES

The first step in the sentencing process is to calculate the advisory guideline range applicable to the offenses of conviction. The PSR correctly calculates Clay's guidelines range.

### A. PSR Calculation and Applicable Guidelines

Under U.S.S.G. § 2K2.1, Clay's base offense level is 24 as prior to the offense he had at least two felony, controlled substance convictions. Clay has three prior convictions for delivery or manufacture of controlled substances. The PSR adds the following three enhancements or adjustments:

| | | |
|---|---|---|
| Stolen Firearm | § 2K2.1(b)(4)(A) | +2 |
| Possession of Firearm in Connection with another felony | § 2K2.1(b)(6)(B) | +4 |
| Reckless Endangerment During Flight | § 3C1.2 | +2 |

With an anticipated three level reduction based on Clay's acceptance of responsibility, Clay's total offense level is 29. R.35: PSR ¶ 31, PageID.110.

Clay has an extensive criminal history which result in a criminal history score of 17. *Id.* ¶ 35-64, PageID.111-129. As Clay was on parole at the time of the offense, he receives an additional criminal history point for a total of 18 and a criminal history category VI. *Id.* ¶ 65-66, PageID.129. With this calculation, Clay's guideline range of imprisonment is 151 to 188 months, however the statutory maximum term of imprisonment is 15 years (180 months). *See* 18 U.S.C. § 924(a)(8). His guideline range is therefore 151 to 180 months. R.35: PSR, PageID148. As detailed further below, the PSR correctly calculates Clay's guidelines.

**B. <u>The Stolen Firearm Enhancement Applies</u>**

The firearm Clay was found in possession of on July 9, 2024, had been reported stolen on March 18, 2024. *Id.* ¶ 11, PageID.107. Under U.S.S.G. § 2K2.1(b)(4)(A), "if any firearm was stolen" the defendant's offense level is increased by two levels. This provision applies "regardless of whether the defendant knew or had reason to believe that the firearm was stolen." U.S.S.G. § 2K21 cmt. n.8(B). This is a "strict liability enhancement." *United States v. Gibson*, 817 Fed. App'x 202, 203 (6th Cir. 2020). Courts have upheld this enhancement noting that "the government has a legitimate interest in punishing possession of a stolen firearm and placing the burden upon one who received a firearm to ensure that the possession is lawful." *United States v. Stokes*, 621 Fed. App'x 316, 319 (6th Cir. 2015) (quoting *United States v. Thomas*, 628 F.3d 64, 69 (2d Cir. 2010). The pistol Clay possessed on July 9, 2024, was reported stolen from a residence in Grand Rapids, Michigan, by its owner on March 18, 2024. Therefore, the two-level enhancement is properly applied.

**C. <u>Clay Possessed the Firearm in Connection to Two Other Felony Offenses</u>**

Clay possessed the firearm in connection to two different felony offenses: felonious assault, in violation of MCL 750.82, for brandishing and/or firing the weapon before police arrived; and possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and MCL 333.7401(a)(a)(iv). Under U.S.S.G. § 2K2.1(b)(6)(B), four levels are added to a defendant's base offense level if they "used or possessed any firearm or ammunition in connection with another felony offense." This enhancement applies "if the firearm . . . facilitated, or had the potential of facilitating, another felony offense" which "means any federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought." U.S.S.G. § 2K2.1 cmt. n. 14(A) and (C). The guidelines commentary specifically notes that this enhancement applies if

the other offense is a "drug trafficking offense" when "a firearm is found in close proximity to drugs." U.S.S.G. § 2K2.1 cmt. n. 14(B)(ii).

The Michigan state law crime of felonious assault occurs when someone "assaults another person with a gun . . . without intending to commit murder or to inflict great bodily harm less than murder." MCL § 759.82(1). Assault occurs when the defendant "either made an attempt to commit a battery or any unlawful act which places another in reasonable apprehension of receiving an immediate battery." *People v. Johnson*, 407 Mich. 196, 209-210 (Mich. 1979). Felonious assault can occur even when the firearm is not discharged. *See, e.g. People v. St. Clair*, No. 331183, 2017 WL 2791466, at *1 (Mich. Ct. App. June 27, 2017) (affirming felonious assault conviction when victim testified defendant pointed the gun at them; court also noted that "felonious assault could be accomplished absent an offender directly pointing a weapon at a victim").

Clay used the firearm he was charged with possessing in connection with felonious assault. On the second 911 call, the store clerk reported Clay had a pistol, Ex. 2 at 01:50-02:16, and Victim 1 reported that Clay was outside the B&B Party Store wandering around with a pistol, Ex. 2 at 02:25-2:46, 03:15-03:40. When police arrived approximately ten minutes later, the clerk reported that he heard gunshots down the street. Ex. 3 at 00:00 – 00:14. Victim 1 and 2 and a third party then arrived at the scene and informed officer that Clay shot at them and their vehicle, pointed the firearm at others in the area around the store, including a vehicle with children inside. Ex. 3 at 00:47-03:40. Clay was quickly identified on the street by the victims and was found to be in possession of an unloaded firearm. While police were unable to find any ballistic evidence in the area, even pointing the firearm at the Victims or other individuals would constitute felonious assault.

Separately, it is a felony to possess with intent to distribute/deliver cocaine, a Schedule II controlled substance. 21 U.S.C. §§ 841(a)(1), (b)(1)(C); MCL 333.7401(2)(a)(iv).[5] During his arrest, officers found both the firearm and a baggie of cocaine on Clay's person. The cocaine was divided into smaller baggies, one of which was weighed by the MSP Laboratory as .91 grams of cocaine, indicating these were for distribution/delivery. The guidelines call for this enhancement to apply when "a firearm is found in close proximity to drugs" because "the firearm has the potential of facilitating" drug trafficking. U.S.S.G. § 2K2.1 cmt. n. 14(B). Where the firearm and drugs were found on the defendant's person, the proximity is "essentially one and the same." *United States v. Frazier*, 426 Fed. App'x 401, 403 (6th Cir. 2011) (citing lower court record). Because Clay possessed the firearm and it was in connection with a drug trafficking offense, the enhancement applies "without any need for further, fact-specific analysis of whether [Clay]'s firearm 'facilitated'" the other felony. *Id.* 426 Fed. App'x at 405. This enhancement is therefore properly applied in the PSR calculation.

**D. <u>Clay Obstructed Justice During His Arrest</u>**

During his arrest, while officers were attempting to secure the firearm, Clay bit Officer Scavarda on the groin. Under U.S.S.G. § 1.2, two points are added to the defendant's offense level "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." Reckless means "the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such situation," USSG § 2A1.4 cmt. n.1, and "means that the conduct was at

[5] It is further a felony under Michigan law to knowingly and intentionally possess cocaine. *See* MCL 333.7403(2)(v)

least reckless," USSG § 3C1.2 cmt. n.2. Additionally, "fleeing" and "during flight is to be construed broadly and includes preparation for flight" so the adjustment applies "where the conduct occurs in the course of resisting arrest." *Id.* cmt. n.3; *see also United States v. Roush*, 527 Fed. App'x 349, 352-53 (6th Cir. 2013). The guidelines define "substantial risk of serious bodily injury" as including "any more serious injury that was risked." USSG § 3A1.3 cmt. n.4(B)

Courts have recognized that biting risks "serious bodily injury because 'a human bite is about the most dangerous bite that one can receive.'" *United States v. Irving*, 431 Fed. App'x 513, 516 (7th Cir. 2011) (quoting *United States v. Sturgis*, 48 F.3d 784, 787 (4th Cir. 1995)) (applying the "official victim" enhancement under § 3A1.2(c)(1) after the defendant fought with arresting officers including biting one officer on the finger). Case law supports that "a human bite has the capacity to inflict serious bodily harm." *See, e.g. United States v. Moore*, 846 F.2d 1163, 1167 (8th Cir. 1988) (ruling related to a bite can support a conviction of assault with a deadly weapon).

Clay bit Officer Scavarda on the groin in the course of his arrest and while officers were attempting to secure the firearm found on his person. *See* Ex. 3. Officer Scavarda received medical treatment at St. Mary's Hospital following the incident and blood was found on his groin, along with a cut to his thumb. R.35: PSR ¶ 10, PageID.107. Clay's bite occurred "in the course of resisting arrest." *See* U.S.S.G. § 3C1.2 cmt. n.3. Even if Officer Scavarda did not suffer a "serious bodily injury," Clay's actions created a "substantial risk" of such an injury. *See* U.S.S.G. § 3C1.2. This enhancement is therefore properly applied.

## III. **18 U.S.C. § 3553(a) FACTORS**

In addition to determining the proper advisory guidelines range, the Court must also consider the sentencing factors under 18 U.S.C. § 3553(a) when imposing and explaining its sentence. *See, e.g.*, *United States v. Hall*, 632 F.3d 331, 335 (6th Cir. 2011) (citations omitted).

The Section 3553(a) factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed. The sentencing factors weigh in favor of imposing a guidelines sentence for Clay

The nature and circumstances of the offenses are serious. Clay, who had only been released on parole for a few months, was found in possession of a stolen firearm and a distribution amount of cocaine. Leading up to his arrest, multiple individuals reported Clay being disruptive and aggressive inside the B&B Party Store, and then proceeding outside where he harassed individuals in the surrounding area, brandished his firearm at individuals, and then potentially shot the firearm at victims and a vehicle. His actions inside the store are on camera, *see* Ex. 1A-1C, and caused the store clerk to call for police assistance, Ex. 2. Parking lot footage shows Clay harassing a woman and following her back to her car. Ex. 1D. When police arrived, the victims appear visible distraught and report they were shot at. *See* Ex. 3. Then, with the victims still nearby, police officers approach Clay who repeatedly ignores their commands and is uncooperative in his arrest. *Id.* He then bites one of the officers while police are locating the firearm.

In addition, Clay has a lengthy and significant criminal history. Clay was on parole at the time of the offense for an incident that is notably similar to the instant case. In 2018 he plead guilty to four different felony offenses in connection with an incident where Clay was reported destroying property at a residence, attempted to flee from police, and was found with a loaded 9mm pistol with an obliterated serial number, a large knife, and 42 grams of cocaine. R.35: PSR ¶ 63, PageID.128-129. Clay was on parole at the time of that offense as well (also for delivery/manufacture of cocaine). *Id.* ¶¶ 62, 63. The PSR identifies 29 different adult convictions (7 of which are felonies) from Illinois and Michigan for a range of crimes including: numerous operating while intoxicated or with a suspended/revoked license convictions; drug possession and

drug delivery/manufacture; fleeing or resisting arrest; domestic violence; and assault. *Id.* ¶¶ 8, 35-63, PageID.106, 111-129. The PSR further states that his juvenile record dates back to the early 2000s, with nine arrests from 2003 to 2007 that records were not received for. *Id.* ¶¶ 73-82, PageID.131-132.

Clay's guidelines calculation is significant at 151 to 180 months (statutory maximum); however, the nature of the offense and Clay's history indicate a need for a significant sentence. The Section 3553(a)(2) factors direct the Court to consider the need to "promote respect for the law," "provide just punishment," "afford adequate deterrence," and "to protect the publish from further crimes of the defendant." Each of these considerations weigh in favor of a significant sentence for Clay whose actions posed a danger to the public and who has not been deterred from committing crimes by prior state court sentences.

## IV. Conclusion

For these reasons, the PSR properly calculates Clay's guidelines and the Court should impose a sentence within the guidelines range of imprisonment of 151 to 180 months.

Respectfully submitted,

ANDREW BYERLY BIRGE
Acting United States Attorney

Date: May 19, 2025

/s/ *Alexia A. Jansen*
ALEXIA A. JANSEN
Assistant United States Attorney
P.O. Box 208
Grand Rapids, Michigan 49501
(616) 456-2404